February 23, 2016
Complaint

# 17CV6441

by ----- unconstitutionally detained detainees detained
              by the city and state of New York

against --- the city aer and state of New York


    PLEASE TAKE NOTICE.  The plaintiffs, detainees incarcerated
at Riker's Island and related facilities including but not
limited to
     George R. Vierno Center
     Anna M. Kross Center
     Manhattan Detention Center
     Otis Bantam Correctional Center

do hereby file complaint against the state of New York and
New York City for the courts of New York City and the state
of New York and their heinous, numerous, and systemic abuses
and violations of the United States Constitution's Sixth
Amendment and the4 right to a "fair and speedy trial".

    The plaintiffs of this complaint include likely between
5000 five thousand and 15000 fifteen thouysand detainees for
whom this complaint's relief and remuneration are applicable.

    The courts of New York City and the state of New York
provide neither a "fair" nor a "speedy" trial and so violate
the constitutional rights of an enormous number of people,
especially those impoverished.

ARGUMENTS:

1. United States law espouses the maxim "innocent until proven guilty." This underlying the United States Sixth Amendment right to a speedy trial. The ethical mandate of such can be argued several ways:

   a.

     1. Incarceration of a person without reason is itself a ~~crime~~ crime against that person and against society.

     2. Incarceration not only deprives a person of their rights, their livelihood, any productive value they may have to their community and society,

     3. but the perverseness of putting a person in a cage causes unavoidable physical and psychological damage to that person in the most hospitable of cages and the New York City and New York State "correctional facilities" are far from most hospitable.

     4. The further crime of indefinite detainment where a detainee has little or no clear idea of when their case will be decided is an additional psychological stress.

     5. A few minutes in court every one to three months does not alleviate this stress in the least.

     6. Clearly, any and all measures must be taken to avoid incarcerating innocent people lest a second crime be committed by the state and city of New York in addition to the the crime alleged by the courts, i.e., the crime of imprisoning an innocent.

   b.

     1. Depriving persons detained of their sixth amendment right to a speedy trial undermines the courts as well as any intention of reform or correction.

2.  An individual cannot really be expected to consider
~~f~~reforming him o~~r~~ herself without clear acceptance of guilt.

3.  Where there has been no completed trial, in society's
eyes, no guilt has been established.

4.  And if an individual cannot see themselves as guilty in
~~society's eyes,~~ in the eyes of society, they cannot be
expected to see themselves as guilty in their own eyes.

5.  Thus there is no possibility of reform or correction.

6~~6~~  And so of course incarceration is without reason in
this regard.

7.  The deprivation of a person's right to a speedy trial
does not in any way give that person the impression of
having done wrong and so been brought to some punishment by
a fair, just, competent, wise, and righteous society.  The
deprivation of a person's sixth amendment right to a speedy
trial does not give that person the impression that they are
being punished by people largely or wholly free of guilt,
people who represent an epitome of rationality, ethics,and
morality in both preach and practice.  On the contrary,
while the New York City Police Department may be swift in
unnecessary violence in the apprehension of a suspect, the
"justice" of the New York City courts is as slow as a retarde
-d tortoise wandering through molasses.

8.  And so the deprivation of a person's sixth amendment
right to a speedy~~t~~ trial represents the courts as incompetent
, unethical, vindictive, ignorant, and small-minded.  The
courts of New York City and New York State are a "kafka-esque
"nightmare composed of the bloated egos of judges, lawyers,

clerks, and court officers, and their willful, ad-hoc, just-this-side-of-precedent administration of near ethicless procedures, judgements, and rulings. The deprivation of a person's sixth amendment right to a speedy trial gives that person only the impression of being manhandled by individuals with more power than they.

9.  Even the most uneducated person can tell that the courts are not as they should be. An educated person with some sens -e of ethics can tell that the courts of New York City and New York state are in fact the opposite of what they should be.

10.  As some basic guideline, the United States has the largest percentage of its population incarcerated of any country in the world. This means that either Americans are the worst people in the world and more deserving of punishmen -t than the people of any other country;  or it means there is something wrong with the courts.

11.  And this complaint places that with violations of the United States sixth amendment as a start.

c.
1.  Bail is not intended as a way to incarcerate people before their case is decided. As for instance by restricting the conditions of their release unreasonably.

2.  On the contrary, it is intended to allow an innocent until proven guilty person to pursue their best defense while still free in body and mind.

3.  Bail ties a person's honor, relationships, and property t to their commitment to participating in the trial of the crim -e they are alleged of commiting.

4.  Even in modern society, bail bondsmen, where there their use is unavoidable, provide an approximation of this or with such in mind should bails be determined.

5.  Not only is pre-decision incarceration of an as yet innocent individual a crime in and of itself, but it also

6.  makes preparing for trial significantly more difficult.

7.  The psychological and sometimes physical stresses of incarceration make preparation for a trial nearly impossible.

8.  Incarceration, meant to drive an individual to reform through the punishment by deprivation of that person's life, however temporary or persistant the punishment, the deprivation of that person's friends, family, livelihood, possessions, and way of life;

9.  where an individual has not been decided by anyone as guilty, this incarceration cannot drive an individual towards reform, but instead only towards a kind of psychosis.

10.  And then in this, said person is expected to compose themselves and participate in their trial rationally lest they deprive themselves of their own defense, and thus the courts of New York City and New York State deprive them of their sixth amendment right to a fair trial as well as speedy

11.  And so every measure must be taken to afford a person with their freedom while they prepare for trial.

12.  But worse, the majority of detainees who are unable to make the largely unreasonable bails assigned by the New York City and New York State courts cannot meet their bails, and so be provided with freedom for their best defense, the majority

the majority of detainees who cannot meet their bails cannot do so because they are impoverished to a lesser or greater degree.

13.  Impoverished individuals are already greatly disadvantag -ed both in society at large as well as in the court given their possibly very restrictive choices of possible legal counsel.

14.  In considering the ethical mandate of the avoidance of the second crime of incarcerating an innocent person, it is also clear that the court should err on the side of the defense.  Another way of seeing this is that

15.  while a guilty person going free may not result in any further crime, imprisoning an innocent person is a second crime.

16.  Similar to erring on the side of the defense as a maxim of law, erring on the side of the poor can be considered a social and ethical maxim as well.

17.  In extremes of wealth and poverty, such as those found in New York City, as the poor have every disadvantage, the rich have the money and power, and that extreme wealth came from somewhere, it can be said that the rich are rich because the poor are poor.

18.  And so in cases dealing with a already greatly disadvanta -ged people, as for those who cannot meet bail, the court ethically must provide every possible relief for the already great disadvantages of the impoverished person.

19.  Especially where such poverty and circumstances of the impoverished person can be easily traced to the decisions of those with the money and power to affect society

; where those with money and power have necessarily, as evidenced by their wealth, determined the circumstances and way of life of an impoverished person.

20.  Thus the courts, in maintaining the United States Constitution's sixth amendment right to a fra fair and speedy trial, must err on the side of both the defense and the poor and so relieve any natural disadvantage brought about by society.

21.  And in considerations of, for whatever reason, even in proper assignations of bail, unavoidable pre-trial incarcerat -ion, such trials must be prioritized above those of individuals who can meet bail, lest an impoverished or poor person be denied their right to a fair trial by being forced to prepare for trial while persistently incarceratioed as described in its effects above.

d.

1.  As a psychological experiment to very vaguely suggest the stresses of incarceration, and especially pre-trial incarceration to an individual who has never been persistantly incarcerated:

2.  Have a friend lock you in a walk-in closet for a day.  Yo You can bring a radio and even some books and your friend will bring you food but you cannot leave.

3.  Now imagine that for a week.

4.  Now imagine it for a month.

5.  Now imagine it for many months.

6.  Now imagine that your friend will let you out of the walk-in closet only when they win twenty dollars on a scratch-off lottery ticket and they only buy a ticket

once a month.

7.  Now imagine that they are not your friend but someone you don't know who has been instructed to think poorly of you and your character.

8.  Now imagine this whole scenario, but you also have to come up with reasons you should be allowed to leave the walk-in closet knowing that if your reasons aren't well-received, you will be not allowed to leave the walk-in closet for an even longer and unknown period of time.

9.  And remember, as this is a psychological experiment, reading this description is very very far from living it.

10.  Please do really have your friend lock you in a walk-in closet for a couple days in actuality to get some understanding of what pre-trial incarceration is like. (For the purposes of this experiment, you can ask them to take you to the bathroom.)  And then perhaps you might be able to start to conceive of the rest of this description.

e.
1.  As further examples of the effects on society of violations of the sixth amendment right to a fair and speedy trial; in

2.  in addition to the clear problem represented by America's comparative incarceration rates:

3.  recidivism.

4.  People raised in impoverished neighborhoods where violence becomes a way of life find no avenue of reform in any aspect of New York City and New York State's courts and "correctional facilities."

5.  Instead these turn challenged children into challenged
adults.

6.  And in other neighborhoods, where the middle class
becomes the poor and the poor become imprisoned, incarceratio
-n does nothing but turn people into beaten down husks with
the mentality of petty theives or hardened criminals ready to
put their life, such as they've been allowed to live it, on th
-e line and "get rich or die trying." A common maxim of the
poor.  T

7.  This is a poor-man's parody of the mentality of the rich
although of course the rich hardly have such difficulties tha
-t they might "die trying."  Other maxims of the impoverished
include

8.  "money, power, respect", suggesting a life of greed and
disregard for ethics and morality.  I.e., one gets the money
, how doesn't matter, then one gets the power, and then one
gets the respect.  No thought to ethics or society is present
in this suggestion of a rule to live by and its accompanying
selfish way of life.

9.  But again, this does closely parody the lifestyles of the
wealthy, whom the impoverished are effectively emulating
but without the advantages of the wealthy and with every
disadvantage.

10.  The point here being that in every way, the "criminal"
poor are simply doing as they see the rich do and in
circumstances determined by the rich as in the administration
and markets of their communities.

11.  As such the poor are as individuals no worse in ethics
and morality than the rich where the latter have every advant

-age, every objectivity, every convenience, and every opportunity to do right be by society and are thus more culpable than the poor.

12.  And in their ease of detachment from their effect on society, so the rich must be judged more meticulously.

13.  And so the United States Constitution's sixth amendment of the right to a fair trial means giving every possible consideration to those impoverished and challenged by society, particularly today's society.

14.  If people are injured or killed in gang wars in impoverished areas with fewer opportunities for jobs that provide a real life, and these areas are sold to by the rich , owned, rented, and administrated by the rich, and inundated with the media glamour of the rich, why would anyone expect other than violence and "crime."

15.  New York City and New York State judges who "throw the book" at such people are only destroying the lives of already battered individuals.

16.  While the unfortunate "satisfaction" aspect of justice is present, one can imagine that, though a family might lose a cherished love one, their likely difficult lives continue on and were they to visit the person who took that cherished loved one from them, some ten years of incarceration later, one might consider if that family would still hold a grudge, especially where when many such families are all too familiar with the experience and effects of incarceration. This might paint sentences of 25-life in a different light.

17.  In considering the courts and their bounds and

responsibilities, they are tasked only with finding justice.  The presences of justice is itself the deterrent to crime.

18.  The presence of justice is itself the deterrent to crime, nothing else.

19.  Where the courts are not fair as with the courts of New York City and New York State, there is no justice, and so incarceration is a meaningless torture,

20.  if not an exacerbation of crime and social problems.

21.  The ills of society are the ills of society and not the domain or responsibility of the courts excepting when the courts are in a position to find justice regarding the circumstances and case of some incident within that society.

22.  This speaks generally to the great demand that the court -s be justice and no more or less and so maintain the United States Consitiution's sixth amendment right to a trial both fair and speedy among other such similar righ -ts of the people.

2.
This complaint further alleges that the Legal Aid Society and

poorly administrated facility for "18 B" pro bono lawyers as

well as their handling by the courts of New York City and

New York State is a violation of the United States Constituti

-on sixth amendment right to a fair trial and such especially

in that those represented by the Legal Aid Society and "18 B"

pro bono lawyers are, as described above, impoverished, in

having too few resources to gain more effective private/paid

legal counsel, and as so further disadvantaged than they

already are, and as described above, so in need of the court's

relief in that disadvantage of their impoverishment. In that

the Legal Aid Society and facilities of the court for the

administration of "18 B" pro bono lawyers are not functioning

, so the violation of the United States Constitution's sixth

amendment right to a fair trial is further exacerbated against

those already disadvantaged.

a.
1.  The unavoidable conflict of iure interest of a public

defender, i.e., the Legal Aid Society and facilities for

administration of "18 B" pro bono lawyers, in that the

public defender is ultimately paid by the same organization

that pays the prosecution; the state;

2.  this conflict of interesst must be absolutely minimized

lest it become a violation of the United States Constitution

's sixth amendment right to a fair trial.

3.  In the case of the Legal Aid Society, very often Legal

Aid attornies work way too closely with the prosecuting

district attorney, sometimes sharing things that the

prosecution should not be privy to and so undermining

their own client's case.

4.  In other cases, the Legal Aid Society effectively works
not for their ~~client~~ legal client, but on behalf of the
state and with the aims of the prosecution in mind.

5.  This is absolutely illegal and means the defendant has
no legal counsel, and effectively two prosecuting parties
, one more clear-cut than the other, and not including the
judge.  And so the defendant's United States Constitutional
right to a fair trial has been completely violated.

6.  As an obvious reminder, the Legal Aid Society as the
public defender is absolutely not culpable in any way for
the actions of any client following their release.  It is
the Legal Aid Society's sole purpose as the public defender
to get their client acquitted and/or released.

7.  In that the Legal Aid Society does not seem to understand
their role as public defender and thus their bounds and
repponsibilities, the Legal Aid Society is largely
misrepresenting their legal clients and their ~~interests~~ legal
clients' interests and to a great degree and so denying their
clients their United States Constitutional sixth amendment
right to a fair trial.

8.  Effectively, impoverished individuals represented by the
Legal Aid Society have no defense afforded them, an illegal
circumstance.

9.  Such individuals are railroaded through cases, denied
their best defense which is their right by law, and many
times lack the education and/or capacity to recognize what is
happening, instead ~~kwn~~ knowing only that something feels
wrong and chalking it up to one more shortcoming of the court

-s and state of New York State and New York City.

10.  Arguments that Legal Aid attornies have "50" or "200" clients per attorney are irrelevant and fall to the courts and the absolute ethical and legal mandate of the United States Constitution's sixth amendment right to a fair AND speedy trial.  If

11.  If the courts are so congested and Legal Aid attornies so overworked that they can provide so few of their clients with fair proceedings and trials, then the courts legally must dismiss cases with obvious considerations to the importance of the prosecution of such cases.

12.  New York City is very wealthy with a huge tax base, and as an example, some billions? to plan revitalizing PENN station.  Surely New York City can provide lawyers to the impoverished individuals who provided the rich with some of that wealth.

13.  In any case, the Legal Aid Society must be administrativ -ely clarified on its bounds and responsibilities if it is to remain the public defender.

14.  Right now, the Legal Aid Society is wef woefully inadequate and more concerned with covering up its culpabilit -y for its attornies' ethical violations, than for the rights of its legal clients.

15.  From pre-trial hearing and grand jury hearing waivers, to unreasonable and unnecessary psychollogical examinations , to conflicts of interest in nearly the worst sense, to lapses of ethics, to simply dealing with clients, the Legal Aid Society is not doing its job and in providing its clients

with such inadequate defense , is violating its clients'
United States Constitutional sixth amendment rights to
a fair trial, and to those already disadvantaged by society.

16.  Similarly, "18 B" pro bono lawyers often significantly
short-change their pro bono clients but assuredly are not
short-changed in turn of the non-liquid benefits afforded
by the state to lawyers who do pro bono work.

17.  A lawyer who commits to a pro bono case must represent
that client to the best of the lawyer's ability regardless
of the difference in payment.  This or not do pro bono work
and let some other lawyer instead, lest they compromise
their client's case with their marginal commitment.

18.  This too is a violation of the United States Constitutio
-n's sixth amendment right to a fair trial and in the
prevalence of such violations, it can only be assumed that
inadequate or difficult to acquire administrative redress is
at fault.  Thus falling to the city and state of New York.

19.  Legal Aid Attorneys may see themselves as overworked,
underpaid, bedraggled civil servants, saints going out of
their way to defend evil indefensible poor people for
heinous crimes;  but the reality is that, as described above,
it is their society that brought about the circumstances of
the poor they are tasked with representing and the poor are
certainly not the ones in charge or administrating their
communities and markets.  And if Legal Aid attornies are
violating the law by short-changing their clients in any way,
they are part of the problem and not part of the solution.
The Legal Aid Society is at best incompetent, and at worst
clerical criminals stealing tax payer money and completely

failing as the public defender.

20.   In any case, this complaint claims that the people most in need of defense have the least defense and that the fault lies with the state and city of New York and its administration of the Legal Aid Society and "18 B" pro bono lawyers er and/or its handling of such in the courts and that this is a violation of the United States Constitution sixth amendment right to a fair and speedy trial.

3.  The failure of the existing remedy of the "30:30" statute, et al.

a.
   1.  The "30:30" statute of New York State law is derivative of the United States Constitution's sixth amendment and this complaint alleges that such statutes are unconstitutional or at the very least interpreted unconstitutionally as a way to nitpick and work around the United States Constitution's sixth amendment.

   2.  The "30:30" statute, et al. are very poor substitutes very poor and unnecessary substitutes for the common sense of a just judge and the United States Constitution's sixth amendment wording of "fair and speedy".

   3.  "fair and speedy"

   4.  No trial under any circumstances could be imagined to require even six months of "kafka-esque" maneuvering, especially where pre-trial incarceration is an issue, as described above.  And the six to twenty two month or more pre-trial incarcerations being practiced by New York City and New York State courts are obviously ludicrous and clearly unconstitutional.  Anmd so illegal.

4.  Justification for a class-action type complaint

a.

1.  A class action complaint is necessary and justified for similar reasons as when bringing a complaint against a corporation by a large number of plaintiffs.

2.  The individual monetary damages are otherwise too small to a interest a competent civil attorney thus denying the plaintiffs their right to a fair civil representation.

3.  Such a class-action complaint also reduces court administration costs otherwise incurred by many complaints of so many people.

4.  This complaint also requests remuneration for costs of any and all adequate civil councile required, as well as complaint filing costs.  Obviously the majority of the plaintiffs are impoverished or indigent.

5. Important additional point regarding the courts of the state and city of New York and their ~~engeing~~ past and ongoigng violation of the United States Constitution's sixth amendment right to a fair and speedy trial and said violation's effect on plea bargaining:

a.
1. The psychological and sometimes physical stresses of pre-trial incarceration are such that many plea bargains obtained by the prosecution during such indefinite detainment are effectively under unlawful duress.

2. Such plea bargains may provide high conviction rates and low false arrest rates and so a short term political talking point for whatever incumbent politican might ~~wish~~ wish to take credit for such,

3. but in the long term they skew important statistics of the courts as well, more importantly of course, as denying people their right to a fair trial and so fair court procedure so violating their United States Constitutio -n sixth amendment rights.

6.  An important additional point regarding the courts of
New York City and New York State, their past and ongoing
violation of the United States Constitution's sixth
amendment right to a fair and speedy trial, and said
violation's effect o in police conduct:

a.
1.  New York City Police Department abuses are a serious
problem and police misconduct and attitudes stem from
the courts, judges, lawyers, and clerks that are
ultimately their superiors.

2.  New York City Police officers are aware of what the
people they arrest go through.  An officer who arrests
someone at a bar fight, knows that that person is not
going to sober up in the drunk tank for a day or two
and then be released.  Instead, they'll spent months
in pre-trial incarceration, they'll lose their job,
become estranged from their family, their health will
deteriorate, and this is assuming they don't have a
criminal record.

3.  A New York City Police officer, doing it for the money
has to deaden any sense of empathy he might or she might
have in order to do their job, knowing the drastic and life
destroying results of any arrest.

4.  A minority of New York City Police officers keep their
conscience and honesty and deal with the contradictions of
working for courts in violation of their own laws, whose
sense of ethics and character is often on par with or
worse than those arrested and so so subjected to such
courts.  This minority becomes extremely jaded and cynical

after a few years on the job.  ~~These~~ Occasionally such
officers that keep their consciences and honesty find
themselves in strange situations.  Such as the officer
who reported falsified arrest statistics and was put in a
mental institution for while for it by his fellow officers,
ultimately being released and suing successfully.  Or the
officer who accidently shot someone and his first,
immediate thought was of his own culpability, saying
"I'm fired", because he still had his conscience and his
honesty to say such a thing.  And so~~m~~ instead of maybe
being fired and maybe some superior taking responsibility
for perhaps putting him in dangerous situations he was not
prepared for or training him better, he was instead
one of the very few New York City Police Officers
convicted of a felony, because he had the conscience to
feel guilty even if it was an accident, where any other
or most other officers would have made excuses to themselves
or simply emptied a clip into a "perp" or choked someone
to death with an illegal chokehold and told themselves that
it was right because they did it, rather than considering
their actions.  The point being that a conscience, a
necessity of any police officer, becomes a liability in
America and this stems from the courts.

5.  The majority of New York City Police Department officers
take as little responsibility as possible.  They become jaded
very quickly and make jokes about justice and fairness
knowing from experience that these things are not available
in the courts of New York City and New York State.

6.  The majority of officers

6.   The majority of officers have the attitude that "everyone is guilty of something," i.e., that whoever they arrest and whatever happens to them because of the courts they work for, they deserved it somehow.

7.   The majority of officers know how heinous the courts are and in protecting both their minds and hearts from that truth as well as their persons from that heinous fate the courts of New York City and New York State afford, they become a more tightly knit, society exclusive, anti-social "brotherhoo -d", where the misxtakes of fellow officers are hidden and ignored lest those officers suffer the same hideouse fates as those they arrest, the "kafka-esque" nightmare of the courts. As well this "brotherhood" develops an anti-social psychology of "us" versus "them."  And the New York City Police Department officers can tell themselves that they're not wron -g for covering up things that affect people's lives or cutting corners to meet some quopta, or worse, that eventuall -y, they're not sociopaths because all the other officers are doing it too.  They are part of a brotherhood and so no -t subject to the same ethics or the same personal inquiry of those who are not part of that brotherhood.

8.   This is ultimately then the enmity between New York City Police Department officers and the communities they are supposed to "serve and protect."  And no amount of societal integration initiatives can resolve that enmity as long as the officers know the fate awaiting those they arrest in the unlawful courts of New York City and New York State.  What results instead is hypocrisy and positive but meaningless statistics.

9.  And then there is the other minority of officers, different from the stressed minority of outcast officers who kept their conscience and honesty, a different minority of officers who didn't join the New York City Police Department to "protect and serve" and didn't join for the money.  They joined to hunt.  They joined to put any feelings of guilt or stress or inferiority on the people they find reason to arrest or harass or worse.  And these are then protected by that majority brotherhood since they are still police officer -s and still tell themselves they are somehow in the right just simply because they wear the uniform and no one wants to feel doubt.

10.  And then there is Police Chief Bratton quoted in the Daily News saying "there are good people and bad people and we have to keep them separate" or something very similar as I recall in an issue in latter 2015.

11.  "There are good people and bad people and we have to kee -p the bad people away from the good people".  In American society today, perhaps it is not clear which is really which. But regardless, there is no room in this statement for reform or mistakes or community; and it is unlikely that Police Chief Bratton is any kind of exception among American police chiefs.  Present also in that phrase is the undeliberated, absolute assignment of guilt to every person arrested regardless of circumstances, as if there is no court and no judges in Police Chiefs Bratton's understanding of New York City and New York State law.  And who could blame hi -m for thinking that.

12. Problems with the police come from problems with the courts.

13. No police officer in New York City or New York State with even a month on the job could be stupid enough to imagine that everything is as it should be and that they in their jobs are resolving a temporary circumstance for everyone's safety and happiness. They are oriented in a "versus the perp", "get the collar" mentality not unlike that of soldiers where the enemy is sub-human and simply a gun target. Soldiers invading an enemy country do not consider themselves as "protecting and serving" the people they are killing, nor can they think about what they are doing, and so American police are in an enemy country. Everything else is lip service and a meaningless coat of paint "protect and serve", department of "correction". Or a friendly face of someone not so jaded for an interview.

14. "protect and serve" To feel for the community they police would be to recognize what the people they arrest are put through, what circumstances they came from, and that ther -s is no justice anywhere to be found and what officer could still do their job knowing that, but a psychopath or an officer whose only real community, the only people he or she would feel responsible to, was the brotherhood of police. And thus there is police misconduct on a massive scale.

15. "Who is the law?"

15. "Who is the law?"

7.  An additional note on a non-comprehensive list of
lasting psychological effects of persistant pre-trial
incarceration:  extreme disorientation, memory loss,
anger, mood swings, self-confidence, self-esteem issues:

a.
1.  In a society where confiden ce is everything, even if
one doesn't that see that as a society of "con men",
being continuously subjugated and treated like an illiterate
animal depresses a person for life, makes one angry or
helpless, sychophantic or deceptive.  Being constantly
treated to the irrational whims of irresponsible guards,
unethical judges, indifferent lawyers, lazy clerks, etc.,
etc., who do whatever they want because no one holds them
accountable, and they have the power, they have the handcuffs
and guns, they have the gavels, they have the phones; this
makes one angry for life.  Faithless even, in an apparently
god-less world or att at least god-less society.  A song of
some rap star "no church in the wild" with police sirens
edited like jungle sounds by a person obviously trying to
reconcile the morality they were teug taught with the reality
of America.

2.  The obvious consequence of treating any person of any
education and any capacity like a caged animal for an
extended period is that they become a caged animal.

3.  A 90's pacino/denier deniro movie H.E.A.T. has a police
detective character threatening a female confidential
informant with the loss of her child to the whims of the
courts:  "gladiator schools", he calls the jails/prisons.
How can so much popular culture represent harsh, unnecessary

, evil realiti9es for decades, and still no one has taken

notice, no one has done anything but band-aids and lip servic

-e as the problems again become worse and worse.

4.  The obvious result of depriving a person of friends and

family and treating them like a caged animal, and especially

without any real legitimate or even legally justified reason,

as with pre-trial incarceration especially, is that they

become a cageed animal.

5.  The first step to rectifying these situations is for the

courts to obey the law and stop violating the United States

Constitution's sixth amendment.

6.  If the rich were beaten down, arrested on any suspicion

of the slightest financial fraud or fuzzy accounting and

then made to suffer the waking nightmare of pre-trial

incarceration, perhaps they would find themselves less

confident to defend their often unethical business practices

and less mentally clear to double-speak, and gloss over their

responsibilities.  Perhaps phrases like "we're just providing

a service" would seem more hollow even to them with their

minds rotted out from pre-trial incarceration.  Or "the money

trickles down" or "such legislation would hurt the american

businessman and the economy would suffer", or a United States

bankruptcy court trustee I spoke to regarding clear sharehold

-er equity fraud:  "buy corporate bonds."

7.  Maybe tax dodgers with offshore accounts and dubious tax

write-offs could be strip searched daily by psychopathic

"ESU" guards who demanded irrationally of them "where's the

tax money?" while tossing their cages for financial

instruments, occasionally sexually harassing them or beating

them up, all while they awaited trial for said accusations.
Then they could be dragged into a court in chains for a few
minutes every couple months to defend their obviously overly
complicated accounting.  They could point to a white board
while back-cuffed, bending over and stretching their acing
wrists to point out all their different shell corporations.
While cuffed and sick from hours in bus cages and gut-rotting
substandard food, they could explain that in fact each
corporation was perfectly legal and no structuring allegation
could be sustained because their shell corporations did in
fact do some bare minimum of legitimate business or however
their highly paid attornies had advised them to safely get
around this and that pesky financial restriction and law.
Then the bailiff could drag them out mid-explanation and back
to months of jail again.  And maybe in a few months of this,
"slightly unethical but legal and all the other corporations
are doing it" would seem more like highly unethical and maybe
not so legal.  SA And then at their most addled and fearful,
they could be offered cop-outs and railroaded into and throug
-h their trial and how might they defend themselves there,
feeling as they might from months of pre-trial incaraeratioen
.  Perhaps their tongues would fail them.
8.  Pharmaceutical executives could be asked how they ethical
-ly justified paying for vacations for key physicians whether
or not it was under the auspices of a "medical conference
sponsored by".  They could be asked if they truly felt their
new drug had enough benefits to be marketed given all the sid
-e effects.  Agaiun, only after pre-trial incarceration had

made them rethink every single thing they had ever done.

9.  Tech companies could be asked which of their patents were actually trivial and how much their engineers were paid out of the bottom line, or whether their new internet product wasn't a potential conflict of interest given their core business, or whether the costs of development of the few new features in their product really justified a new expensive version and forcing customers to upgrade.  All this and more they could be asked, just after staring at the walls of a cage for a few months.

10.  Music producers could be asked why they so heavily marketed a new album with lyrics that bad had clear negative social values and were largely aimed at a teenage girl demographic.  They could croak out "free speech" while suffering whatever illnesses they had picked up given their weakened state from pre-trial incarceration and jail health conditions.  Or maybe they'd end up mumbling incoherently and sent back to jail with a "730" psychological exam see scheduled.  They could be treated as poorly as possible, as if they were somehow evil infants, until they stopped saying "free speech" because perhaps the words had seemed to lose all meaning.

11.  The district attorney and the police could tack on charg -es, making each case seem more and more legitimate.  Any movement of a corporation's fund would be "money laundering." Any advertising would be "extortion."  And isn't it?  What American child doesn't desperately fear not having the latest product sold to them by brainwashing, repetitive, manipulativ

-e ads.  Their friends and peers disregarding them if they
don't immediately tweet and facebook their ownership.  The
latest 200 dollar sneakers made by children and old women in
malaysia for pennies; though I hear they're trying to get
the childrens' wages up, so that's good.  And corporate
executives citing corruption in the economies and governments
of third world countries could have a judge point out to them
that that was irrelevant to the case against them and weren't
they leading the world?

12.  And the question this complaint asks is not should all
this be done to the rich, though perhaps someone should ask
that question, the sole question here is instead would those
individuals be able to defend themselves in any way against an
any of these accusations, were they ~~sent~~t~ pre-trial
incarcerated for months beforehand, their lawyers as well.

13.  We the plaintiffs do hereby demand that should this
complaint not be seen as an extremely important first step
and immediately necessary to correct United States
Constitutional violations, we the plaintiffs then do here
-by request trial by jury on this complaint.

8.  Regarding Relief and Remuneration

a.  "The obvious and most important first relief to the
horrors of pre-trial incarceration is release.  Thus this
complaint and we the detainees of Riker's Island and
associated "correctional" facilities of New York City and
New York State who have had our United States Constitutional
sixth amendment rights violated do request our immediate
release.  Where numerous New York City and New York State
judges have thrown away both ethics and common sense and
allowed mostly impoverished, disadvantaged people to be
incarcerated indefinitely while the Legal Aid Society,
"18 B" pro bono lawyers, private/paid lawyers often with
less than scrupulous ethics, and the district attorney did
give these impoverished, disadvantaged people the run-around
, mangle and mea maneuver their cases at leisure, all while
their clients suffered.

1.  What's suggested by this complaint's relief?

2.  This complaint is mea not intended to suggest an additio
-nal statute to replace the 30:30, etc., statutes.  It is
intended to immediately relieve the ongoing suffering of
impoverished individuals who are incarcerated pre-trial.

3.  The 30:30, etc., statutes and motions requesting
dismissal under said statutes should be a last resort to
ending persistant pre-trial incarceration, if said statutes
are still considered constitutional at all,

4.  A competent fair judge should have some sense of society
and some understanding of the consequences of pre-trial
incarceration and some respect for the rights of all the
people he or she presides over, not just the lawyers.

5.   And every case is different.   That's why there are judges.

6.   Nevertheless, the United States Constitution's sixth amendment is there for a reason and its violation in the courts of New York City and New York State is so prevalent that there is now an immediate need for the relief of the unlawful suffering of thousands and the degree of the abuses of the sixth amendment by the courts is so extreme that the individual differences in the cases for whom this complaint applies can largely be ignored.

h.   Won't releasing so many detainees cause a spike in crime? Won't obeying the sixth amendment of the United States Constitution in the future increase crime?

1.   If it does, then the real crime rate has been masked by unlawful courts.   A possible circumstance very damaging to critical government statistics.

2.   As described earlier, the courts' responsibilities are not all inclusive.   They are only to justice.

3.   Violating the United States Constitution's sixth amendment is only a short term fix with very bad long term consequences as have been seen for decades, as described above, for example, recidivism.

4.   A poor offhand analogy might be that of badly administrated early chemotherapy techniques for a cancer patient.   Its not a cure.   It might put the cancer in remission but the patient, i.e., society's, hair falls out, their immune system weakens and they may die of any number of things.

5.  If a decision on this complaint ultimately rests not on ethics, morality, or law, but on political talking points and who takes what blame, then surely a politician who corrected the courts with a clear long-term vision of decades ahead, a vision towards the good of society, ~~reedu~~ reducing recidivism and police misconduct and brutality, all of this in one fell stroke, surely such a talking point would come across clearly to a majority of the population, especially given current United States incarceration rates.  And ultimately, if you don't want the responsibility, you shouldn't have the power.

6.  Additionally the remuneration this complaint requests for those most harmed by United States Constitution sixth amendment violations would be enough to give those individual -s a cushion to live on while they find some way of life or move to some distant, less challenged community.

7.  If social workers and discharge planners helped individua -ls for whom this complaint applies, use their awarded funds wisely,although ultimately leaving it up to them, their advic -e would be many times more helpful than what such social workers do in "correctional facilities" presently, which is generally deceive themselves and detainees that everything is okay and the detainees just made some mistake in an otherwise perfect society and then offer minor, obvious services that should be way easier to get and irrelevant to pre-trial individuals, assuming their sixth amendment rights were not already being violated.

n. What about claims of 'revolving door justice'??

1.  Situations of "revolving door justice" are already very much the case.  But not because the individuals convicted are

released, but because they come back to jail, society
failed by the "correctional" facilities, by parole boards
that, like New York City police officers, act with unethical,
unempathetic, anti-social, "us and them" mentality that
ultimately stems from judges that, far from paragons of ethic
-s and morality, violate the United States Constitution's
sixth amendment, among other things.

2.  Parole boards act like traps intended to force recently
released, previously convicted individuals to go from a
perverse, angry, ~~violate~~ violent place where everyone is
treated as a caged animal to being a complete ~~saqi~~ saint in
a ~~mostlyt~~ corrupt society filled with temptations and
financial and other challenges.  To double up on the
societal expectations on an individual who has had
societal disadvantages doubled up on him or her already is
another recipe for recidivism.

3.  If society were functioning and the extremes of rich and
poor resolved, the dysfunctional ways of life of both the
free rich and the impoverished and imprisoned poor resolved,
then crime would lessen to the point where the very few
criminals that still existed could all be given country club
incarcerations intended in whole for reform where possible
and of long enough sentences to appease those physically
wronged by said individuals, while a far far different
prison experience might, in its hospitality, be ethical for
long years until the individual actually was reformed and it
was safe for them to return to a society that was very much
unlike American society today.  And this only for those
individuals who had truly committed heinous acts and clearly
had no ethics in a society of otherwise easy living for all

and good people.

4.   In stark contrast to American society today where a lack of ethics is absolutely the norm rather than the extreme exception and heinousness means almost nothing given the day to day living necessities of the impoverished and the America -n culture they are drowned in and the ease with which a wealthy individual can casually lower the standard of living for millions for his or her own benefit with hardly anyone noticing and fewer able to complain.

5.   The point here is one, you can't make an omelette without breaking eggs, and two, you can't have a healthy society or "fix" crime or reform "criminals", if the courts, hjudges, and lawyers aren't following the law.  And that's assuming you know who the real criminals are, those on the inside of the jails or those on the outside in penthouses and mansions.

6.   But regardless, this complaint demands a first step in obeying the United States Constitution and its sixth amendment , and it demands this first step urgently on behalf of those who are suffering most.

RELIEF AND REMUNERATION

1. As mentioned, New York City and New York State are very
wealthy with a large tax base.  If New York City and
New York State courts cannot afford to prosecute crimes in a
timely fashion, detainees must be released lest their
United States Constitutional sixth amendment rights to a
fair and speedy trial be violated, and there must be some
remuneration for those mostly impoverished people already
so violated by the greatly psychologically and sometimes
physically harmful harmful experience of pre-trial
incarceration in persistent violation of their United States
Constitutional sixth amendment right to a fair and speedy trial.

2. We the plaintiffs first request that this complaint not
prevent detainees for whom this complaint applies, ( nor those
for which it does not, obviously) from filing other complaints
regarding any aspect of the courts and their incarceration.

3. While no price can be put on suffering, the incarceration
experience varies greatly from individual to individual.  A
person who may have been assaulted by guards; had his or her
health jeapordized by food or treatment; been slashed where
guards in a higher classification are were negligent; been
especially misrepresented, misled, ignored and stone-walled,
or violated otherwise by the New York City courts: all these
circumstances call for complaints and remuneration of their
own and for this complaint to deny said individuals additional
relief and remuneration appropriate to their circumstances
would be a travesty.

4. Similarly, it is also important that, should this complaint
be affirmed, the reliefs and remuneration awarded not set any

low precedent for such awards lest future detainees who have had their civil and Constitutional rights violated be denied full relief and remuneration for their circumstances, and as well lest the courts and administration of the courts of New York City and New York State see no real need to improve the situation going forward and United States Constitution sixth amendment violations continue.

5.  This complaint seeks relief and remuneration for the low average minimum of detainees wrongen by New York City and New York State courts' violations of the United States Constitution's sixth amendment.

6.  For alleged crimes less than murder, detainees held for longer than two months shall be released unconditionally and paid five hundred dollars per day for every day past two months. (  As some measure of common sense:  one month for pre-trial wrangling and one month for trial.  )

7.  For alleged crimes of murder and greater, detainees held for longer than four months shall be released unconditionally and be paid five hundred dollars per day for every day past four months.  (  Double the wrangling and trial period allotted by some measure of common sense for lesser crimes.  )

8.  As an allowable exception, for detainees held for especially heinous crimes, deviating greatly from the majority of detainees, and specifically with that characteristic, this complaint would find itself not applicable if the prosecution can apply for and demonstrate real reason for the delay and otherwise denial of United States Constitution sixth amendment rights.

9.  I.e., hundreds of co-defendants or witnesses to depose, or a victim or witness undergoing recovery at a hospital for many

months, etc., some real strain on the resources of the prosecutio
-n, or otherwise unavoidable and pertinent delay.

10.   And still, and especially with impoverished individuals, the
court should minimize pre-trial incarceration, prioritizing those
who cannot meet even appropriately assigned bail,

11.   And still err on the side of the defense.

12.   Though ultimately it can be said that the affirmation of
this complaint is for the good of the state and society, this
complaint requests some third party for accountability
regarding the very large number of individuals for whom this
complaint applies.

13.   Presumably it will be trivial to look up New York City and
New York State detainees incarcerated for any period greater than
that for which this complaint would apply immediately following
the affirmation of this complaint so that affected detainees
would by relief and remuneration have some measure of their
previously violated rights and lives restored.

14.   But this complaint also requests that, in the future, this
be done at the first of each month to prevent United States
Constitution sixth amendment rights' violations that may occur
while the courts adjust to a clearer understanding of the law.

15.   Also, given that many of the detainees for whom this complai
-nt applies are indigent and possibly homeless, it is important
that social services or discharge planning account for this in
handling the requested reliefs and remunerations.

16.   The courts must follow the law before others will.

17.   The courts must know ethics and morality before others can.

18.   "Let he who is without sin cast the first stone."

EXAMPLE PLAINTIFFS OF THIS COMPLAINT

This is obviously NOT an exhaustive list of plaintiffs for whom
this complaint applies, as there are likely thousands.

These are simply those individuals with whom I am in direct
contact with.  It seemed imprudent and unnecessary to list more
than names and book and case numbers as anything else can be
easily looked up.

PLAINTIFFS:

Peter Bohning (author)
B/C 349 15 06853

Juel Roundtree
B/C 349 15 05801

Eugene Cox
B/C 141 15 02204

Elio Santamaria
B/C 441 15 97320

Foskey Donnail
B/C 900 14 00640

Marvin Bland
B/C 113 15 01116

J
Jazz Bennett
B/C 141 15 00985

Sherwin Robinson
B/C 300 15 00258

Jonathan Bennett
B/C 349 15 06416

Kenneth Reynolds
B/C 349 15 10316

Roman Ochoa
B/C 349 15 13297

Rafael Lopez
B/C 441 15 00477

SamPedro, Juan
B/C 300 15 00504

Gerardo C. Martinez
B/C 441 15 07329

Atreyu Kennedy
B/C 900 15 00067

Kenneth Martin
B/C 241 15 06958

Thirman Caudle
B/C 241 15 07030

Ramon Resio
B/C 349 15 01970

Jayme Rodrigeus
B/C 349 14 03013

Joel Paulino

Joel Paulino
B/C 113 15 01049

Pulido Ruben
B/C 441 15 07900

Andrei Roper
B/C 349 15 07786

Jordan Rodriguez
B/C 241 15 05424

Craig Sydorowitz
B/C 349 14 13104

Lenny Goodman
B/C 441 15 08400

Brandon Pell
B/C 349 15 09261

JOSE PIZARRO
895/601897

Dorm 19 West Lower B

| NAME | BKC | Signature |
|------|-----|-----------|
| 1 Jose Pizarro | 895160/897 | |
| 2 Edwin Hernandez | 3491700629 | Edwin Hari |
| 3 Antonio Chavarria | ~~8411702540~~ 2411702476 | |
| 4 *Leeshon Sargeant | 4411602495 | |
| 5 Joseph Rivera | 8251700565 | J Rivera |
| 6 Christopher Cano | 2411605369 | ~~Christopher Cano~~ |
| 7 Trent Patterson | 895N501746 | Trit Patt |
| 8 Steven Thompson | 5411701328 | |
| 9 Peter Hall | 895160/763 | PHall |
| 10 Luis Sierra | 2411704365 | Luis Sierra |
| 11 Ayala Joseph | 349-17-06882 | Joseph Ayala |
| 12 Balwinder Singh | 900-1700-147 | Balwinder Singh |
| 13 Ayala Ricardo | 241-17-03839 | Ricardo Ayala |
| 14 Kenneth Martin | 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 | Kenneth Martin |

| # | Name | BKC | Signature |
|---|------|-----|-----------|
| 15 | Rafael Castro | 8513670081 | Rafael Castro |
| 16 | Singh Shingara | 8957700318 | |
| 17 | John Irizarry | 1411705342 | John Izyary |
| 18 | Trysta Murray | 3491704750 | |
| 19 | Jovan Velez | 2411602618 | Jovan Velez |
| 20 | Jerry Medina | 8951700964 | Jerry Medina |
| 21 | Chilo, Muhammad | 4411491860 | |
| 22 | Loudel Baez | 141170178 | Loudel Baez |
| 23 | Robert Moco | 895-1700593 | |
| 24 | Renardo Maye | 141611453 | R. Maye |
| 25 | Miguel Marrero | 241-16-07789 | Miguel Marrero |
| 26 | Feliks, Kayumov | 349-170-3954 | Felik Kayum |
| 27 | Luis Rodriguez | 300760091 | L. Rodriguez |
| 28 | William Hernandez | 349-17-05190 | William Hernandez |

| | NAme BkC | Signature |
|---|---|---|
| 29 | Brian Solano 241-14-11395 | |
| 30 | Joseph CANCemi 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 | Joseph Canci |
| 31 | Yudelfi MARINEZ 349160 7186 | |
| 32 | Jonathan Conz 4411704141 | |
| 33 | Aurelio Moschoun 4411600404 | |
| 34 | Antonio CHAUARRIA 2411702476 | |
| 35 | Juan Alarco 4411702192 | |
| 36 | Robert AponR 3447702834 | |
| 37 | NEIFRY LOPEZ 2411707474 Larry Campfield 441701589 | |
| 38 | Simeon Marcus 2411700629 | |
| 39 | Frank Mandella 541-17-00266 | |
| 40 | Joseph Reziotti 8951700299 | |
| 41 | Richard Callison 3447707255 | Richard Callison |

| | Name BKC | Signature |
|---|---|---|
| 43 | SHAWN BRITTON 1411704980 | |
| | Terence Godwin 3491612829 | Terence Godwin |
| 44 | DAVID Scott 3491709390 | |
| 45 | HECTOR JIMENEZ 1131700660 | Hector Jimenez |
| 46 | ALEJANDRO Guzman 241-17-04063 | |
| 47 | | |
| 48 | | |
| 49 | | |
| 50 | | |

Dorm 19 west LA

| | Name | BKC# | Signature |
|---|---|---|---|
| 1. | VLADIMIR AGUSTIN | 895-17-00193 | |
| 2. | Kendall Felix | 431601317 | |
| 3 | ANTWYNE LUCAS | 541/6-01195 | |
| 4 | Shaheaun Atkinson | 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 | Shahean Atkin |
| 5 | Miguel Viruet | 141-170-5878 | Migel Viru |
| 6 | Hernandez | 1607533 | |
| 7 | Rodolfo Pinedo | 3491705968 | Rodolfo Pined |
| 8 | Albert Cruz | 2411700363 | |
| 9 | Joshua Rodriguez | 3491704852 | J Rodrigues |
| 10 | Jose Molina | 2411702971 | Jose Moli |
| 11 | Jose Cortez | 349-1702176 | Cortez |
| 12 | Raphael Diaz | 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 | |
| 13 | Cherokus Hill | 3491611356 | |
| 14 | STEVEN CARLONE | 3491705158 | |
| 15 | Leslie Farfan | 411702725 | Leslie Far |
| 16 | Charles Del toro | 2411703225 | Charles D |
| 17 | Gilberto Pérez | 3491612135 | |
| 18 | Enger Calderon | 3491701668 | |
| 19 | BORRERO Jesus | 1411706159 | |
| 20 | Manuel Espinosa | 1411705459 | |
| 21 | Phillip Boykin | 4411608383 | |
| 22 | Daniel Ebron | 4411705247 | |
| 23 | Manuel Rendon | 2411704456 | M Rendon |
| 24 | Matthew Mann | 8251700054 | M Mann |
| 25 | NELSON Collado | 1491705631 | nelson colla |
| 26 | Ibragimor Axmadshan | 1411705050 | |
| 27 | Paul | 7411702847 | |

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK)
                                        ss:
COUNTY OF Bronx )

_____ Jose Pizarro _____, being duly sworn, deposes and says:

That I have on this 9 day of _____ Aug _____ 20 17 , placed and submitted in

the postal receptacle the following documents:

_____ CLASS ACTION Southern District _____ in the New York City

Correctional Facility known as _____ A M K C _____, located at

_____ 18-18 HAZEN St. EAST Elmhurst NY 11370 _____ to be

duly mailed via the United States Postal Service to the following parties in the above action:

Cheif District Judge
Hon Loretta A Preska
500 pearl St
nyc ny 10007
Clerk of Court
Ruby J. Krajick
500 pearl St
nyc ny 10007

Respectfully submitted,

Sworn to before me this
_____ 9 day of August , 20 17

_____
NOTARY PUBLIC

TAKARA S. STRONG
Notary Public, State of New York
Registration #01ST6302691
Qualified In New York County
Commission Expires May 5, 20 18

# **AFFIDAVIT OF SERVICE**

STATE OF NEW YORK)

                 ss:

COUNTY OF Bronx )

JOSE PIZARRO , being duly sworn, deposes and says:

That I have on this 17 day of _____ Aug _____ 20 17, placed and submitted in

the postal receptacle the following documents:

Peter Bobouug Class Action in the New York City

Correctional Facility known as _____ A M K C ., located at

18-18 Hazen St East Elmhurst AY11370 to be

duly mailed via the United States Postal Service to the following parties in the above action:

Chief District Judge
Hon. LORETTA A. PRESKA
500 pearl St.
nyc, ny. 10007
Clerk of Court
RUBY J. KRAJICK
500 pearl St
nyc ny 10007

Respectfully submitted,

Sworn to before me this
17 day of August , 20 17

NOTARY PUBLIC

TAKARA S. STRONG
Notary Public, State of New York
Registration #01ST6302691
Qualified In New York County
Commission Expires May 5, 20 18

MR. Jose Pizarro
18-18 Hazen Street
East Elmhurst, N.Y. 11370

Legal Mail: Fr...

USMPB
SDNY

To: United State District Court
Southern District of New York
Chief U.S. District Judge
Hon. Loretta A. Preska
Clerk of Court
Ruby J. Krajick
500 Pearl Street
N.Y.C., N.Y. 10007

RECEIVED
SDNY DOCKET UNIT
2017 AUG 23 PM 3:37